# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

MYCHOICE, LLC,

    Plaintiff,

v.

TAIV, INC.

    Defendant.

Civil Action No. 2:23-cv-00507-JRG-RSP

**RESPONSIVE CLAIM CONSTRUCTION BRIEF
OF DEFENDANT TAIV, INC.**

# TABLE OF CONTENTS

RESPONSIVE CLAIM CONSTRUCTION BRIEF OF DEFENDANT TAIV, INC. ................... 1

I.   INTRODUCTION ............................................................................................................. 1

II.  THE DISCLOSURE OF THE '658 PATENT .................................................................. 1

III. DISPUTED TERMS .......................................................................................................... 4

    A.   The Preambles of the Independent Claims (1, 9, 13) are Limiting .......................... 4

    B.   "user" ........................................................................................................................ 7

    C.   "user preference" ...................................................................................................... 9

    D.   "user preference … associated with the user" requires no additional construction beyond "user preference" ........................................................................................ 11

    E.   "detecting in real time" / "detected in real time" ................................................... 11

    F.   "content attribute" .................................................................................................. 13

    G.   "monitor[ing] station" ............................................................................................ 15

IV.  CONCLUSION ............................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*ASM Am., Inc. v. Genus, Inc.*, 401 F.3d 1340 (Fed. Cir. 2005)...................................................10

*Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341 (Fed. Cir. 2020)..................................................15

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,

   55 F.3d 615 (Fed. Cir. 1995) ......................................................................................................5

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002).......................5

*Eli Lilly and Co. v. Teva Pharma. Int'l GmbH*, 8 F.4th 1331 (Fed. Cir. 2021) ..........................6, 7

*Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) .............................12

*H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014) .....................................9

*Interval Licensing, LLC v. AOL, Inc.*, 766 F. 3d 1364 (Fed. Cir. 2014) .......................................12

*Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376 (Fed. Cir. 2022)....................................16

*Pacing Technologies, LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021 (Fed. Cir. 2015) ........................7

*Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009)...........................................12

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ......................................................1, 9, 10

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ........................10

*Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306 (Fed. Cir. 2013).................................9

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)...........................................1

*Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007).............................................9

I.      **INTRODUCTION**

Plaintiff MyChoice argues that it "construes the disputed terms in accordance with their plain meanings," but as MyChoice's citations to the record show, the disputed terms have a specific meaning in the context of the specification and claims.  Dkt. 50 at 1 ("MyChoice Br.").

The "ordinary and customary meaning" of a term in a patent claim "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" and that person of ordinary skill in the art "is deemed to read the words. . . not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  "[T]he specification 'is always highly relevant to the claim construction analysis . . . . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315, *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

MyChoice contends that no terms require construction.  But in the course of making its case that no construction is needed, it repeatedly argues for specific meanings, demonstrating that a "plain and ordinary meaning" construction would be incorrect.  In contrast, Taiv's proposed constructions for U.S. Patent No. 10,708,658 ("'658 Patent") are consistent with how a person of ordinary skill in the art would understand the claims in light of the disclosure of the entire '658 Patent.  The Court should adopt them.

II.     **THE DISCLOSURE OF THE '658 PATENT**

The '658 Patent is aimed at "facilitating an enhanced video viewing experience" for users by swapping out undesirable content.  '658 Patent at 1:1:18; *see also id.* at Abstract.

MyChoice argues that the '658 Patent is a significant advance over the prior art because, it says, the prior art could not "detect when undesirable portions of media streams had ended." MyChoice Br. at 2.  But the '658 Patent does not actually disclose any way of detecting when the

1

undesirable portions of a media stream have ended (or begun), and MyChoice does not identify any. MyChoice's description of the state of the art is highly misleading. In fact, methods for viewers to swap between undesirable portions of a program were not limited to recording for later viewing or manual switching as MyChoice contends. In fact, MyChoice's principal and the inventor of the '658 Patent, Richard Theriault, was issued a prior art patent that discloses exactly this. Mr. Theriault's prior art patent, U.S. Patent No. 9,021,518 describes a "system that allows a user who subscribes to the system to avoid viewing commercials with unacceptable content (e.g. alcohol related, sexual content) during real-time television broadcasts." Ex. A ('518 Patent), Abstract. This system "has a residential component consisting of a control unit having a user interface[,] a local database and a specialized router, a remote processing component having monitoring stations where the monitored network feeds are processed, and a system DBMS component that stores channel and user information in real time . . . [t]he control unit retrieves real-time data associated with viewable content and applies logic to switch the viewing channel or signal source for display on the television." *Id.*

Thus, automatic switching between undesirable and desirable content in real time was known (by MyChoice) before the filing of the patent-in-suit. It appears that the inventor missed deadlines to prosecute his earlier application and now attempts to improperly broaden his invention by avoiding the proper construction of the claims.

In practice, the '659 Patent discloses little more than the steps of detecting undesirable content in a media stream, labeling that content as undesirable and switching the video stream, then changing the label and the stream again when the undesirable content is no longer detected. The patent does not disclose any method for detecting the undesirable content, and does not

disclose how to switch between streams, except to describe generic "trigger signals" that change the media source from one stream to another. In short, it essentially describes channel surfing.

Users viewing content in a media stream use the claimed system to automatically avoid undesirable content. '658 Patent at 2:58-60 (Figure 1 shows a system for "replacing undesirable content in a media stream for viewing by a user."). "[R]eplacing undesirable content in a media stream provides viewers with a highly individualized video viewing experience." *Id.* at Abstract. As shown in Figure 1, below, the claimed invention uses a "monitoring station," which interfaces with an "output device" that transmits media to a user's display. *See* '658 Patent at Abstract; Fig. 1. Every independent claim requires that the monitoring station send signals to the output device that instruct the output device to switch the media stream sent to the user's display so that the user does not view the undesirable content.



FIG. 1

The "User 700 interfaces with the system via a user interface, shown in the present embodiment as a software application installed on a mobile communication device, MCD 140, such as a cellular telephone, tablet, or computer." *Id.* at 3:13-15. "Any type of content which a specific user generally does not desire to watch may be characterized with a user preference." *Id.* at 3:58-60. Content in the system is catalogued by "content attributes," which are generated from

3

several possible sources. They "may be transmitted to by a content provider to the monitoring station along with a media stream, such as a metadata indicating genre, content theme, etc. which may be provided with a cable television program," they "may be generated automatically by analysis software which cooperates with the monitoring station," and "[f]or some content, content attributes may be manually input to the database, such as by an operator associated by the monitoring station or by one or more users of the system." *Id.* at 4:58-67. "Content attributes are descriptive of some characteristic of the content" and include items such as genre (including " drama, news, sports, reality, documentary, and others), location (including various cities, states, and countries), temporal attributes including "historic time periods, years in which programs are filmed or aired, holiday seasons, etc."), participants (such as "a cast member, producer, sports team, announcer, reporter, etc."), or they "may relate to events, keywords, images, content providers, or combinations of other attributes." *Id.* at 4:46-57. User preferences are mapped to these content attributes and used to decide whether content will be liked or disliked by the user watching a given media stream and thus, whether the media stream should be switched or not.

### III.     DISPUTED TERMS

#### A.     The Preambles of the Independent Claims (1, 9, 13) are Limiting

The preambles of the independent claims provide antecedent basis for the key terms of the claims, and they recite necessary context for the claims as a whole. Thus, they properly limit the scope of the claims.

While "[n]o litmus test defines when a preamble limits claim scope . . . , dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002), *citing*

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("[W]hen the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects."). "Likewise, when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Id.* (citing *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999).

As MyChoice admits, the preamble of claim 1 provides antecedent basis for "undesirable content," "first media stream," and "output device." MyChoice Br. at 5. MyChoice fails to note that it also provides the antecedent basis for the disputed term "user" and the phrase "primary content attribute." In fact, nearly a third of the words in the preamble of claim 1 are terms for which the preamble provides the antecedent basis (14 of 45 words). *See* '658 Patent, 7:61-8:40 (claim 1). The same is true of claim 13 (6 of 17 words). *Id.* at 10:13-52 (preamble providing the antecedent basis for the terms "output device," "media," "display," and "user"). The preamble of claim 9 is identical to that of claim 1 other than the leading clause which describes the claim as covering a computer readable medium—"An article comprising a tangible medium that is not a transitory propagating signal encoding computer-readable instructions that, when applied to a computer system, instruct the computer system to perform . . . ." *Id.* at 9:14-23. Even including the long lead-in, the terms of claim 9 for which the preamble provides antecedent basis represent just under 20 percent of the words. *See id.* at 9:14-54 (preamble providing antecedent basis for "first media stream", "output device," "undesirable content", and "primary content attribute").[1] The preambles provide much of the structure for the claims, they do not merely recite a statement of intended use as MyChoice contends.

---

[1] The term "the system database" in claim 9 lacks antecedent basis entirely.

MyChoice appears to concede that the preamble is limiting where it provides antecedent basis for claim terms but argues that the phrase "display viewable by a user" cannot be limiting because it is solely "a statement of the result and does not provide substance to the claim." MyChoice Br. at 7.  This phrase provides antecedent basis for the terms "user" (in every independent claim) and "display" (in claim 13).  Putting that aside, MyChoice's argument that "display viewable by a user" is a non-structural statement of intended use is conclusory.  The result of the method is not that the display is viewable by a user; the result of the method is that "undesirable content in a first media stream" has been replaced.  The "display viewable by a user" is not a purpose of a display or the intended use of a display; the claim is limited to displays viewable by a user.  This is a structural limitation of the system.

And even if a "display viewable by a user" was a statement of intended purpose, the Federal Circuit has observed that the "case law does not support [a] binary distinction between statements of mere intended purpose on the one hand and limiting preambles on the other." *Eli Lilly and Co. v. Teva Pharma. Int'l GmbH*, 8 F.4th 1331, 1340 (Fed. Cir. 2021).  In fact, the Federal Circuit has found a preamble that was undeniably a statement of purpose limiting where it used the term "user," "because the term 'user' in the preamble provided antecedent basis for that term later in the body of the claim," just as the preamble provides antecedent basis for the term "user" in claims 1 and 13.  *Id.* at 1341, quoting *Pacing Technologies, LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1023-24 (Fed. Cir. 2015) (finding the preamble "[a] repetitive motion pacing system for pacing a user ...," limiting).  MyChoice's analysis is contrary to law, and the preambles of the independent claims are limiting, as Taiv proposes.

6

**B.** **"user"**

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "a person watching the display" |

The intrinsic record defines what the user in the claims is: the person watching the media streams on a display. This tracks the basic idea of the invention, the entire point of which is switching media streams to keep the user from viewing undesirable content.

This is reflected in the claims. For example, claim 1 recites "[a] method of replacing undesirable content in a first media stream being received by an output device which transmits media to a display viewable by a user." '658 Patent at 7:61-64. The content is known to be undesirable because it "corresponds to a user preference indicating undesirability, the user preference indicating undesirability associated with the user." *Id.* at 8:1-3. Because different users might find different kinds of content undesirable, "[t]he term user preference is used generally to describe both likes and dislikes associated with a specific user." '658 Patent at 3:48-50; *see also id.* at 3:58-60 ("Any type of content which a specific user generally does not desire to watch may be characterized with a user preference."). Each of the independent claims requires detecting undesirable content by identifying content attributes that correspond to user preferences indicating desirability or undesirability. *See* '658 Patent at claim 1 ("detecting in real-time . . . the undesirable content in the first media stream, wherein the undesirable content corresponds to a user preference indicating undesirability"); *id.*, claim 9 ("after the undesirable content corresponding to the user preference indicating undesirability is detected in real-time in the first media stream"), *id.*, claim 13 ("detecting in real-time undesirable content in the first media stream . . . wherein the undesirable content corresponds to a user preference indicating

7

undesirability"). Those user preferences are only relevant to the switching process because the user is the one viewing the media stream and thus viewing potentially undesirable content.

The direct link between the viewing user and the user's preferences regarding what content is (un)desirable is repeated throughout the specification. *See id.* at 5:45-47 (Figure 3 shows an example "where Content 2 is the primary *content being watched by users* 1-N who have corresponding User Profiles 1-N."); 3:58-60 ("Any type of *content which a specific user generally does not desire to watch* may be characterized with a user preference.") (emphasis added). The specification directly equates users with viewers in the example described in Figure 4. *Id.* at 6:37-44 ("*The users each have a profile* in the system database which associates them with a number of user preferences. Tom, Dick, and Harry may be *generally characterized as similar viewers*. . . . as the example illustrates, *the user preferences enable the system to provide custom viewing experiences for each*.") (emphasis added).

That the claims could have recited "viewer" instead of "user," as MyChoice argues, is immaterial. The plain language of the claims recites "display viewable by the user;" the user must therefore be a person viewing the display. That the user could do other things in addition to viewing the display is both irrelevant to what is actually claimed and not at all contrary to Taiv's proposed construction. A user might also record user preferences, offer input to the monitoring station, or perform the other tasks identified by MyChoice in addition to viewing the display. None of those other things are excluded by Taiv's construction, and they are not required by the claims. What *is* required is that the user is the person viewing the display. The preferences of a particular user are what is used by the monitoring station to decide whether content is desirable or not for that user, so that the invention may "facilitat[e] an enhanced video viewing experience

8

reflective of individual viewing preferences." '658 Patent at 1:16-19.  If the user is not the viewer, the patent cannot perform its intended purpose.

Lastly, MyChoice contends that, because, in other cases involving other claims, this Court has decided that the term "user" does not need construction, it should do so here. Unrelated patents are, of course, largely irrelevant to the claims of the '658 Patent.  *See Phillips*, 415 F.3d 1303 at 1324 (other sources may not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.").  Even so, the Federal Circuit has approved of constructions for the term "user" on many occasions.  *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1320 (Fed. Cir. 2013) ("The term 'user' cannot be construed in a vacuum, as required by Taurus's proposed construction. Instead, it must be construed in light of the written description in which it resides") (citing *Phillips*); *see also H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1331 (Fed. Cir. 2014) (construing "user of said phone" and "said user"); *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007) (construing "user").  Taiv's proposed construction is the only proposal consistent with the intrinsic evidence.

    C.    **"user preference"**

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "likes and dislikes of the user" |

Taiv's proposed construction of this phrase is drawn directly from a definition in the specification:  "The term user preference is used generally to describe both likes and dislikes associated with a specific user."  '658 Patent at 3:48-50.  When, as here, a patentee defines a term in the specification, it controls.  *ASM Am., Inc. v. Genus, Inc.*, 401 F.3d 1340, 1343–44 (Fed. Cir. 2005) (noting that the patentee defined "evacuation" by reciting "In the context of the

9

present invention, the term 'evacuation' is used generally referring to the removal of reactant residues in the vapor phase."); *see also Phillips*, 415 F.3d at 1316; *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("[P]atent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term. In such a case, the *definition selected by the patent applicant controls*.") (emphasis added).

Bolstering the conclusion that this language was intended to define a "user preference" is the fact that the section of the specification relied on by Taiv is the only place that describes what a user preference is, rather than what a user preference is for. *See generally id.* at 3:40-60. And contrary to MyChoice's assertion, it is not described as a preferred embodiment, unlike the sections describing other figures. *Compare id.* at 2:45-46 ("FIG. 1 is a schematic diagram of an embodiment of a system for replacing undesirable content in a media stream.") with *id.* at 2:47-48 ("FIG. 2 is a timing diagram for a method of replacing the undesirable content."). The specification of the '658 Patent does not use the word "embodiment" anywhere in the discussion of Figure 2, unlike Figures 1, 3, 4 and 5. There is no reason that the patentee's definitional language should not control.

MyChoice criticizes Taiv's construction for two reasons. First, it asserts that this term has a "plain and ordinary meaning" and thus requires no construction. MyChoice Br. at 9. But MyChoice cites no evidence to support the notion that there is a plain and ordinary meaning for this term or that it would be readily understandable to one skilled in the art.

Second, MyChoice contends that a "user preference" must be broader than a user's likes and dislikes, because the term typically appears in the claims in the context of phrasing like "a user preference indicating undesirability" (or desirability). MyChoice Br. at 9. But MyChoice points to nothing in the intrinsic evidence to show that the term is broader than a like or dislike,

10

or that it includes unspecified information about user "choices and settings." *See id.* The definition in the specification, and Taiv's proposed construction that applies it, is entirely consistent with the use in the claims and should be adopted here.

### D. "user preference … associated with the user" requires no additional construction beyond "user preference"

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "likes and dislikes associated with the user" |

As MyChoice suggests, Taiv does not contend that this term requires construction beyond applying the proper construction of "user preference" within the larger phrase. *See supra*, § III.B.

### E. "detecting in real time" / "detected in real time"

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "without perceptual delay from the user's perspective" |

The phrases "detecting in real time" and "detected in real time" require construction. A patent claim must have "objective boundaries" such that the public knows the scope of the patent owner's potential monopoly, or it is invalid as indefinite. *Interval Licensing, LLC v. AOL, Inc.*, 766 F. 3d 1364, 1371 (Fed. Cir. 2014). "Real-time," which is not defined in the specification, must have a concrete meaning so that the '658 Patent properly puts the public on notice of what is claimed. *See Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009) (describing the public notice issues that arise where "real-time" could mean varying amounts of time); *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (emphasizing that claim language should "provide a clear-cut indication of the scope of subject matter

11

embraced by the claim"), *overruled on other grounds, Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Each of the independent claims requires that the monitoring station detect undesirable content in real-time, but the specification does not affirmatively define "real-time" in the context of the invention. Thus, Taiv's proposed construction is derived from a respected extrinsic source, the Microsoft Computer Dictionary, which describes "real-time" in relevant part as those operations "in which the machine's activities match the human perception of time." Ex. B (Microsoft Computer Dictionary 5th Ed. (2002)) at 441.

Taiv's proposal is also consistent with the specification. The only arguable description of "real-time" in the specification is the disclosure that "the monitoring station is monitoring games 1-4 for undesirable content in real time (i.e., without the content being time-shifted)." '658 Patent at 6:34-36. MyChoice contends that this language, in essence, defines the term, despite its contention that the term needs no construction. MyChoice Br. at 12-13. But if this disclosure defines "real-time," the specification fails to convey how much delay (or "time-shifting") is within and without the scope of the claims. To the extent MyChoice contends that "real-time" means "not pre-recorded" as they describe the prior art, then it remains open as to how much of the media stream may be recorded for the process to be happening "in real-time," i.e. how much delay may be introduced.

The only concrete guidance offered by the specification is that detecting undesirable content in real time and switching the media stream to different content happens "nearly simultaneously, or with barely perceptible delay." '658 Patent at 3:65-4:7. This disclosure is congruent with Taiv's proposed construction ("without perceptual delay from the user's perspective"). Given that the user is the one viewing the media output, it is logical that any delay

12

would be measured from that user's perspective.  MyChoice's proposed "plain meaning" construction would leave the term vague enough as to be meaningless (is a five-second delay "real-time"?  Five minutes?).  The Court should adopt Taiv's proposed construction.

### F. "content attribute"

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "attribute descriptive of a characteristic of content" |

Again, MyChoice contends that a term of art with no meaning outside of the intrinsic record should be accorded an unstated "plain and ordinary meaning."  The Court should adopt Taiv's construction, which is derived from the unambiguous language of the intrinsic evidence.  The specification defines content attributes, describing that "[c]ontent attributes are descriptive of some characteristic of the content . . ."  '658 Patent at 4:46-48.

MyChoice cites to the same paragraph from which Taiv's construction is drawn to argue that Taiv's construction is improper, but omits the relevant sentence.  MyChoice Br. at 14 (citing '658 Patent at 4:55-57).  In context, Taiv's construction is correct; the patentee explains what a content attribute is, and then gives various examples, including those identified by MyChoice:

> **Content attributes are descriptive of some characteristic of the content; some examples of content attributes follow**. A group of genre attributes may include drama, news, sports, reality, documentary, and others. A group of location attributes may include various cities, states, and countries. A group of temporal attributes may include historic time periods, years in which programs are filmed or aired, holiday seasons, etc. A group of participant attributes may include a cast member, producer, sports team, announcer, reporter, etc. Other content attributes may relate to events, keywords, images, content providers, or combinations of other attributes.

*Id.* at 4:46-57.  Here, the specification recites several examples of content attributes, including "genre," "location," "temporal," "participant" and so on, then goes on to note that it could also include "events, keywords, images, content providers, or combinations of other attributes."  Each

13

of these is a way to describe characteristics of content, including the images (such as using a thumbnail to describe content) and keywords that MyChoice thinks are outside the scope of Taiv's proposed construction. Neither does the specification say that content attributes *are* "images," as MyChoice suggests. It discloses that content attributes may "relate to" keywords, images, or various other attributes. Nothing cited by MyChoice shows that content attributes include anything other than something descriptive of a characteristic of content.

*Baxalta Inc. v. Genentech, Inc.* does not compel adoption of a "plain meaning" construction here, contrary to MyChoice's assertion. In *Baxalta*, the trial court was reversed for relying on a "generalized introduction" to disputed term—antibodies—as the definition. 972 F.3d 1341 (Fed. Cir. 2020). Unlike the coined term "content attribute," an antibody is an existing physical class of chemical for which a general introduction might be helpful. More importantly, the primary reason the Federal Circuit overturned the district court's construction in *Baxalta* was that the challenged construction excluded real-world categories of antibody—bispecific antibodies—that were expressly recited in the dependent claims. Reasoning that the definition would not exclude a class of antibody expressly claimed, the Federal Circuit reversed. *Id.* Unlike the terms at issue in *Baxalta*, MyChoice does not (and cannot) identify anything in the claims that is excluded by the patentee's definition of "content attribute." MyChoice points to the list of content attributes recited in claim 6, but those types of content attribute (an event attribute, a location attribute, a genre attribute, a temporal attribute, a participant attribute, a keyword attribute, or an image attribute) are all descriptive of a characteristic of the content to which they apply, as Taiv's construction requires. The Court should adopt Taiv's proposal, which tracks the definition used in the intrinsic evidence.

14

G. **"monitor[ing] station"**

| MyChoice Construction | Taiv Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "device that monitors the media stream and sends trigger signals to the output device" |

Taiv's proposed construction of "monitoring station" is consistent with the claims and specification. As the summary of the invention puts it, "a monitoring station detects undesirable content in a first media stream." '658 Patent at 1:54-55. When it finds it, it transmits a "first trigger signal . . . to an output device," which causes the output device to switch to a second media stream. *Id.* at 1:60-64. The monitoring station also "monitors the first media stream for an end to undesirable content." *Id.* at 1:65-66. "When an end to undesirable content is detected, the monitoring station transmits a second trigger signal to the output device, and the output device switches from the second media stream to the first media stream." *Id.* at 1:66-2:3. The independent claims are consistent with this description. Each requires that the monitoring station detect content in a media stream and send one or more trigger signals to an output device. Taiv's proposed construction is simple and conforms to the intrinsic evidence.

MyChoice admits that the monitoring station performs operations that include "monitoring the media stream and [] sending trigger signals to the output device." MyChoice Br. at 16. Contrary to its assertion that a "plain meaning" construction is appropriate, MyChoice's entire criticism of Taiv's construction appears to be that Taiv should have proposed a more limiting construction that includes additional functionality beyond the functions recited above.

MyChoice argues that the monitoring station "performs many varied operations" not included in Taiv's construction, and that Taiv's construction therefore excludes functionality that is disclosed by the patent. MyChoice Br. at 16. This argument is backwards—a construction

15

that requires the monitoring station to include certain limitations does not exclude it from doing more. And importing each of those functions into the definition would be improper where every additional aspect of the monitoring station identified by MyChoice is either recited only in the dependent claims or not claimed at all. *See Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it…"). Taiv's proposed construction is consistent with the disclosures of the specification and the claims and should be adopted.

## IV.  CONCLUSION

Accordingly, Taiv respectfully requests that the Court adopt its proposed constructions.

Dated: March 5, 2025                   Respectfully submitted,

By:   /s/ *Phillip Haack*
Ryan Marton (CA 223979 *admitted E.D. Tex.*)
Hector Ribera (CA 221511 *admitted E.D. Tex.*)
Phillip Haack (CA 262060 *admitted E.D. Tex.*)
**MARTON RIBERA SCHUMANN & CHANG LLP**
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone:   (415) 360-2515
Email:       ryan@martonribera.com
             hector@martonribera.com
             phaack@martonribera.com

***COUNSEL FOR DEFENDANT
TAIV, INC.***

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above is being served on the counsel of record via the CM/ECF system on March 5, 2025.

By: /s/ *Phillip J. Haack*
Phillip J. Haack