**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MYCHOICE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2:23-cv-0507-JRG-RSP |
| | § | |
| TAIV, INC., | § | |
| | § | |
| Defendant. | § | |

**CLAIM CONSTRUCTION ORDER**

MyChoice, LLC, accuses Taiv, Inc., of infringing claims of U.S. Patent No. 10,708,658, which relates "to methods and systems for facilitating an enhanced video viewing experience reflective of individual viewing preferences." '658 Patent at 1:17–19. The parties present six disputes about claim scope. Having considered the parties' briefing, along with arguments of counsel at an April 2, 2025 hearing, the Court resolves those disputes as follows.

## I. BACKGROUND

The patent describes a need for a system that can predict when during a program a viewer wants alternate content, can provide that content based on user preferences, and then return to the program when appropriate. '658 Patent at 1:37–41. As shown in Figure 1 (below), the patent meets this need with an output device (102) with a network interface (104), a monitoring station (120), a display (130), a mobile communication device (MCD) (140), and a system database (150). The network interface receives media streams (501) from the content sources (601). The figure suggests those content sources could be any of streaming, over-the-air, or satellite-based content sources. A user (700) interfaces with the system via the MCD, which is in direct communication

with the monitoring station and the system database. The system stores user preferences in the system database. *See generally* '658 Patent at 2:58–3:39.




FIG. 1

Figure 2 (below) shows how the system operates. A first media stream (501) includes primary content, which is typically content selected by a user, and undesirable content that begins at time t1 and ends at time t2. The monitoring station (120) detects the undesirable content in the first media stream and, in response, sends a first trigger signal (202) to the output device (102). The monitoring station also directs the output device to a second media stream (502), which contains substitute content. In response to receiving the first trigger signal, the output device switches the display (130) to the second media stream. When the system detects the end of the undesirable content, the monitoring station transmits a second trigger signal (204) to the output device. In response, the output device switches the display back to the first media stream. *See generally* '658 Patent at 3:40–5:12.




FIG. 2

Claim 1 recites this methodology as:

1. A method of replacing undesirable content in a first media stream being received by an output device which transmits media to a display viewable by a **user**, the first media stream containing primary content having a primary **content attribute**, the method comprising the steps of:

   **detecting in real-time**, by a monitoring station, the undesirable content in the first media stream, wherein the undesirable content corresponds to a **user preference** indicating undesirability, the **user preference** indicating undesirability associated with the **user** and stored in a system database;

   selecting substitute content, by the monitoring station, wherein the substitute content has a plurality of substitute **content attributes**, at least one of the plurality of substitute **content attributes** associated with the primary **content attribute** and the primary **content attribute** associated with a first **user preference** indicating desirability, and at least one of the plurality of substitute **content attributes** directly associated with a second **user preference** indicating desirability;

> responsive to detecting in real-time the undesirable content in the first media stream, transmitting, from the monitoring station, a first trigger signal, and directing the output device to a second media stream containing the substitute content;
>
> further responsive to detecting in real-time the undesirable content in the first media stream, configuring, in the system database, an undesirable **content attribute** and associating the undesirable **content attribute** with the first media stream;
>
> wherein the output device switches from the first media stream to the second media stream in response to the first trigger signal;
>
> after transmitting the first trigger signal, monitoring, by the monitoring station, the first media stream for an end to the undesirable content;
>
> responsive to detecting the end to the undesirable content in the first media stream, transmitting, from the monitoring station, a second trigger signal to the output device;
>
> further responsive to detecting the end to the undesirable content in the first media stream, changing, in the system database, the undesirable **content attribute** associated with the first media stream; and,
>
> wherein the output device switches from the second media stream to the first media stream in response to the second trigger signal.

’658 Patent at 7:61–8:40 (disputed terms in bold). In addition to disputing the scope of the terms emphasized *supra*, the parties dispute whether the preambles of Claims 1, 9, and 13 are limiting.

## II. LEGAL STANDARDS

“[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.” *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J.,

concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.

Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party proffers a level of ordinary skill in the art. The Court will therefore resolve the level of skill only to the extent necessary to resolve the parties' disputes.

## IV. THE DISPUTED TERMS

### A. Whether the Preambles of Claims 1, 9, and 13 Are Limiting

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| No construction necessary; preamble not limiting | Preambles are limiting |

These independent claims recite a method, an article, and an output device. The preamble of Claim 1 recites "[a] method of replacing undesirable content in a first media stream received by

an output device which transmits media to a display viewable by a user." '658 Patent at 7:61–63. The preamble of Claim 9 recites:

> 9. An article comprising a tangible medium that is not a transitory propagating signal encoding computer-readable instructions that, when applied to a computer system, instruct the computer system to perform a method of replacing undesirable content in a first media stream being received by an output device which transmits media to a display viewable by a user, the first media stream containing primary content having a primary content attribute . . .

*Id.* at 9:14–21. Claim 13 is directed to "[a]n output device which transmits media to a display viewable by a user . . . ." *Id.* at 10:13–14.

The parties dispute whether the preambles of these claims are limiting. MyChoice focuses its argument on "display viewable by a user," which it says is merely a statement of intended purpose. Dkt. No. 50 at 4–5. Taiv responds the preambles provide antecedent basis for key terms of the claims. Dkt. No. 51 at 5. Taiv also asserts that "display viewable by a user" is a structural limitation of the claims, the intended purpose of which is to replace "undesirable content in a first media stream." *Id.* at 6.

The Court agrees with Taiv. In each of the three claims, "[d]isplay viewable by a user" limits "output device." That is, the "output device" must be one that transmits media to a display. Moreover, Claims 1 and 9 limit "first media stream" to the media stream being received by the output device. And the body of both Claim 1 and 13 recite "the user," which refers not just to "a user," but to a user who can view a display connected to an output device that is receiving the media stream.

Claim 9 includes even more structural language. The preamble starts with "an article comprising," and then proceeds to limit the "article" to "a tangible medium that is not a transitory

propagating signal." The claim also limits the first media stream to require "primary content having a primary content attribute." Given the extensive antecedent basis provided by the preambles of these claims, the Court holds they are limiting.

### B. "user" (Claims 1–14)

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| No construction necessary; plain and ordinary meaning<br>"a person who uses or has used the invention" | "a person watching the display" |

Taiv says the intrinsic record defines a "user" as "[a] person watching the media streams on a display." Dkt. No. 51 at 7. For example, the specification shows an example "where Content 2 is the *primary content being watched by users*." *Id.* at 8 (quoting '658 Patent at 5:45–47, 6:37–44 ("The users each have a profile in the system database which associates them with a number of user preferences. Tom, Dick, and Harry may be generally characterized as similar viewers . . . .")).

MyChoice agrees a user is a person, but says the term is much broader than Taiv's construction. It extends, says MyChoice, "to individuals who may 'use' the claimed system either through development, testing, purchasing, deployment, installation, or viewing, but they do not have to necessarily be a viewer." Dkt. No. 50 at 7. Also, the specification shows "a 'user' is not limited to someone who is actively watching the display." *Id.* at 7 (citing '658 Patent at 7:31–40). For example, a user could be someone recording user preferences in the system before displaying the media. *Id.* Or a user could be more than one person. *Id.* at 7–8. MyChoice offers "a person who uses or has used the invention" as a construction. *Id.* at 9.

The Court rejects both parties' constructions. Regarding Taiv's construction, nothing about the claim suggests the display must be viewed. But MyChoice's construction is too broad, because

a skilled artisan would not understand a "user" to be a developer, tester, or purchaser. Rather, the display need only be "viewable" when, as the preamble of Claim 1 recites, "a first media stream being received by an output device [is transmitted] to a display." '658 Patent at 9:18–20. Accordingly, the Court construes "user" as "a person who can view the display."

### C. "user preference" (Claims 1, 4, 5, 8–13)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "likes and dislikes of the user" |

Claim 1 requires detecting undesirable content in the first media stream based on "a user preference indicating undesirability," '658 Patent at 7:66–8:2, and substituting other content for that undesirable content based on the user preference, *id.* at 8:5–13. Claim 9 recites "communicating . . . a user preference indicating undesirability." *See also id.* at 10:–21–29 (reciting, in Claim 13, receiving, "responsive to the monitor station detecting in real-time undesirable content . . . , a first trigger signal and a second media stream containing substitute content, wherein the undesirable content corresponds to a user preference indicating undesirability"). The parties dispute the scope of "user preference."

Taiv says the patent defines the term "user preference" as "likes and dislikes of the user." Dkt. No. 51 at 9 (quoting '658 Patent at 3:48–50 ("The term user preference is used generally to describe both likes and dislikes associated with a specific user."). MyChoice responds that "user preference" refers to desirability or undesirability, which is broader than "likes and dislikes." Dkt. No. 50 at 9. It says Taiv's construction would make the term redundant in view of the surrounding claim language. *Id.* It also accuses Taiv of relying on an exemplary embodiment. *Id.* at 9–10.

The Court agrees with MyChoice. The passage on which Taiv relies is not definitional in

part because it uses the word "generally." Moreover, it does not say user preferences "*are* likes and dislikes" of a user, but that the term *generally describes* "both likes and dislikes" of a user. The same paragraph also explains those preferences "may [be] learned by the system based on viewing habits," '658 Patent at 3:46, which cuts against the notion of always requiring "likes and dislikes" as Taiv's construction suggests.

Because the Court finds no intent to redefine the term, the Court will give "user preference" a "plain and ordinary meaning" construction." *See Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1370 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee . . . must clearly express an intent to redefine the term."). Further, the Court finds no basis for necessarily associating the term with "the user" recited elsewhere in the claims, although other claim language may impose such a limitation. *See, e.g.*, '658 Patent at 8:2–3 (reciting, in Claim 1, "the user preference indicating undesirability associated with *the user*").

**D. "detecting in real-time"/ "detected in real time" (Claims 1, 9, 13)**

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| No construction necessary; plain and ordinary meaning<br>"not time-shifted" (Dkt. No. 50 at 11) | "without perceptual delay from the user's perspective" |

Each of these claims requires that the monitoring station detect undesirable content in real time. *See* '658 Patent at 7:66–67, 9:29–31, 10:22–23. The parties dispute what "in real-time" means in the context of the patent.

Taiv relies on a dictionary definition for its construction, Dkt. No. 51 at 12 (citing Microsoft Computer Dictionary, Dkt. No. 51-1 at 441), and cites the specification's statement that "real time" means "without the content being time-shifted," *id.* (quoting '658 patent at 6:34–36). *See also* '658

Patent at 3:65–4:7 (explaining switching the media stream to different content happens "nearly simultaneously, or with barely perceptible delay").

MyChoice objects to connecting "real time" to the user's perception for two reasons. First, the user does not perceive the "detecting" step of the claims. Dkt. No. 50 at 11. Second, the specification describes "real time" more broadly. *Id.* (quoting '658 Patent at 6:34–36).

The Court agrees with MyChoice that a construction connecting the detecting step to the user is improper. Instead, the specification defines "in real time." *See* '658 Patent at 6:34–36 ("the monitoring station is monitoring games 1–4 for undesirable content in real time (i.e., without the content being time-shifted)"). The applicant's "use of 'i.e.' signals an intent to define the word to which it refers." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009). Accordingly, the Court construes "in real-time" as "without the content being time-shifted."

**E. "content attribute(s)" ('658 Patent, Claims 1, 3, 4, 6, 9, 13)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "attribute descriptive of a characteristic of content" |

The parties dispute whether "content attributes" must actually be attributes of content. Taiv cites the specification's explanation that "content attributes are descriptive of some characteristic of the content." Dkt. No. 51 at 13 (quoting '658 Patent at 4:46–57). According to MyChoice, however, the patent uses "content attributes" to refer to more than mere descriptions of the content. *Id.* at 14–15 (citing '658 Patent at 4:55–57). It asserts Taiv's construction would create an inconsistency with Claim 6 and cites *Baxalta Inc. v. Genentech*, 972 F.3d 1341 (Fed. Cir. 2020), for the proposition that general statements don't rise to the level of lexicography. *Id.* at 15.

The Court agrees with Taiv. The specification's explanation that "content attributes are

descriptive of some characteristic of the content" is simply a statement of the ordinary meaning of the term. *See* https://www.yourdictionary.com/attribute ("A characteristic or quality of a person or thing."). Although MyChoice asserts some of the specification's examples are not descriptive of the content itself, Dkt. No. 50 at 14, the specification doesn't say that. Instead, the specification shows events, keywords, images, and the like may be *types* of attributes for describing the content. Regardless, even if some of the examples could not be descriptive of the content itself, MyChoice makes no effort to establish implicit lexicography or otherwise explain why the apparent ordinary meaning of "content attributes" should not apply. Accordingly, the Court construes this term as "attribute(s) descriptive of a characteristic of the content."

**F. "monitor station" / "monitoring station" (Claims 1–14, 8–14)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | "device that monitors the media stream and sends trigger signals to the output device" |

Taiv bases its construction for this term on excerpts from the Summary. Dkt. No. 51 at 15 (quoting '658 Patent at 1:54–2:3). Confusingly, MyChoice first accuses Taiv of importing limitations, Dkt. No. 50 at 16, but then says the monitoring station does *much more* than monitor the media stream and send trigger signals, Dkt. No. 53 at 9 ("a construction that fails to capture all of the disclosed functions of the monitoring station unfairly limits the claim term"). Taiv doesn't dispute that a "monitor station" may also perform other functions—only that it must perform these. Dkt. No. 51 at 15–16.

Both parties' positions as somewhat flawed. Taiv points to the Summary's description of embodiments rather than a description of the invention as a whole. Taiv also describes its construction as "consistent with" the claims and specification, but "consistency" is not a basis for

construction. MyChoice, however, accuses Taiv of importing limitations by not including enough limitations in its construction.

Neither party disputes the scope of “station.” Nor does either party dispute what it means to “monitor.” Accordingly, the Court will give this term a “plain and ordinary meaning” construction.

## V. CONCLUSION

| Disputed Term | The Court’s Construction |
|---|---|
| Preambles of Claims 1, 9, 13 | Limiting |
| “user”<br>(Claims 1–14) | “a person who can view the display” |
| “user preference”<br>(Claims 1, 4, 5, 8–13) | Plain and ordinary meaning |
| “detecting in real-time” / “detected in real time”<br>(Claims 1, 9, 13) | **“**in real time**”:** “without the content being time-shifted” |
| “content attribute(s)”<br>(Claims 1, 3, 4, 6, 9, 13) | “attribute(s) descriptive of a characteristic of the content” |
| “monitor station”<br>(Claims 1–4, 8–14) | Plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party’s claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court’s reasoning in this opinion.

**SIGNED this 24th day of June, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE